ALBANY,
Jan 1812.

COLEMAN *against* SOUTHWICK.

THIS was an action for a libel. The declaration stated that the plaintiff was a good and faithful citizen of the *United States*, and of good fame, &c. and pursued the occupation and employment of editor of a certain newspaper printed and published in the city of *New-York*, called the "*New-York Evening Post*," by which he acquired great gains and emoluments, &c. Nevertheless, the defendant well knowing the premises, but contriving and maliciously intending to injure and aggrieve the plaintiff in his good name, &c. and also in his occupation and employment, and to bring him into great scandal, infamy and disgrace, and to cause it to be believed, &c. that the plaintiff had been guilty of the crime of treason, and of the promulgation of treasonable sentiments, and that the plaintiff had attempted to excite a *civil war*, &c. and was under the influence of an unprincipled devotion to *Great Britain*, &c. on the 3d *October*, 1809, at the city of *Albany*, wrote and published in a newspaper, printed and published by the defendant, called "*The Albany Register*," a certain false, scandalous and malicious libel, containing, among other things, the false, scandalous and malicious words and matters following. [Here the whole publication was set forth with *innuendoes*, but it is unnecessary, in reference to the decision of the court, to set forth the libellous paper and the other papers read at the trial, and inserted in the case.]

The publication of the defendant referred to and recited a piece as taken from the *Evening Post*, of *Tuesday* evening, *August* 23, 1809, and which made the subject of the alleged libel.

By reason of the writing, printing and publishing of which said false, scandalous and malicious libel, &c. the plaintiff alleged he had been greatly injured in his good name, &c. and had been strongly suspected by those to whom his innocency was unknown, of the crime of treason, and of promulgating treasonable sentiments, and also of an unprincipled devotion to the cause of *Great Britain*, and had likewise been injured in his occupation and employment, and subjected to great personal scandal, hatred and infamy, &c. to the damage of the plaintiff 5,000 dollars.

Where a declaration for a libel, after stating the plaintiff's good name, &c. stated that the defendant well knowing the premises, &c. maliciously intending to injure the plaintiff, &c. and to bring him into great scandal and disgrace, and to cause it to be believed that the plaintiff had been guilty of the crime of treason, and of the promulgation of treasonable sentiments, &c. published the libel; it was held that these were not averments necessary to be proved, but mere suggestions, by way of inducement to the libel. Where A. published a libel, taken from a paper published by B. as an extract from a paper published by C. it was held, in an action brought by C. against A. that the testimony of D. that he heard A. before he published the libel, ask E. whether he had not seen it, in the paper of C. and that E. answered that ' he had,' was inadmissible, in mitigation of damages; but that E. himself should be produced, if his declarations were proper evidence.

In actions for *slander*, *libel*, and other *personal torts*, the court will not grant a new trial, on the ground of *excessive damages*, unless the amount of damages is so flagrantly outrageous and extravagant, as manifestly to show that the jury must have been actuated by passion, partiality, prejudice, or corruption.

The defendant pleaded the general issue, and gave notice that he would give in evidence, in justification of the publication, that the matter contained in the supposed libel was true ; and set forth in his notice, an article published in the *New-York Evening Post*, of the 19th *August*, 1809, as containing the sentiments imputed to him by the defendant; and further, that the supposed libel is composed of an article, purporting to be an extract from the *New-York Evening Post*, published by the plaintiff on the 23d of *August*, 1808, and of remarks upon that extract and on the plaintiff, in reference to his having published the matter and sentiments therein contained; and that the defendant copied the said extract from, and published it on the authority of a certain newspaper, printed in the city of *New-York*, called the *Public Advertiser*, and that the defendant believed it to be a true extract, according to the purport thereof; and that it is substantially a true extract, from the articles published by the plaintiff in the *Evening Post*, on the 19th and 23d of *August*, 1809, and that as to the literal variance therein, the defendant did, in the next paper published by him, after the one containing the supposed libel, on being informed of the variance, publish an entire correction thereof, &c.

The cause was tried at the *New-York* sittings, in *June*, 1811, before Mr. Justice *Thompson*.

The plaintiff proved the publication of the libel by the defendant, in the *Albany Register*. The counsel for the defendant then moved for a nonsuit, on the ground that the libel produced and read in evidence, did not support the charge of treason, as alleged by the plaintiff, but the motion was overruled by the judge.

*Samuel North*, a witness for the defendant, testified, that the extract purporting to be taken from the *Evening Post*, was seen by him, in the *Public Advertiser*, a newspaper printed in the city of *New-York*, dated 23d of *September*, 1809, in the defendant's possession, on *Saturday*, before the publication complained of, and that the *Evening Post*, published by the plaintiff, arrived in *Albany* on the morning of the 2d of *October*, 1809, when the witness saw it in the possession of *D. Rodman*, and discovered that the plaintiff had denied the publication, as stated in the *Public Advertiser ;* but the witness did not inform the defendant of this fact until nine o'clock in the evening of that day, when several hundred of the papers of the defendant were struck off, to be sent by the western mail; but were not then actually sent.

The defendant then offered to prove, by the same witness, that

on *Saturday*, the 30th of *September*, 1809, he heard the defendant ask *Henry Stanley*, a resident of the city of *New-York*, whether he recollected that the extract, as published in the *Public Advertiser*, had appeared in the paper published by the plaintiff, and *Stanley* replied that he did. This evidence was objected to by the plaintiff's counsel, and rejected by the judge.

*Solomon Allen*, a foreman in the printing-office of the defendant, testified, that the defendant did not take the *Evening Post* published by the plaintiff, but the *Herald*, which came by mail, and did not arrive in *Albany* until after the papers of the defendant on the 3d of *October* were all struck off. That they usually strike off, on *Monday* evening, about four hundred papers for the western mail, which closes at eight o'clock in the evening ; that the remainder of the impression is made on *Tuesday* morning. That the editor's remarks are usually delivered to the witness on *Saturday* or *Monday*, before noon, to be printed. That the paper produced, bearing date the 6th of *October*, was published by the defendant, and contained the extracts from the *Evening Post*, corrected.

The witness further stated, that the impression of the defendant's paper amounted to between 1,500 and 2,000 copies, and that to have struck out the libellous matters after eight o'clock, on *Monday* evening, and substituted other matter, would have detained the press about three hours; and that to have struck out the libellous matter, and inserted a notice to the public that the extract was incorrect, would have occasioned a delay of several hours ; but might have been done in the course of the night; but that neither was done, and the paragraph in question passed through the whole impression. It was usual for the defendant, when any news of importance arrived, to stop the press, and insert it, in the place of matter deemed less important. The printer of the *Evening Post* testified that the alterations mentioned might have been made in one hour.

The plaintiff's counsel then read the whole of the editorial article in the defendant's paper of the 6th of *October*, 1809, on the subject of the libellous publication in question, of which an extract only had been read on the part of the defendant. The plaintiff's counsel also read the whole article contained in the *Public Adver-tiser* of the 23d of *September*, part of which had been read by the defendant's counsel. The explanatory publication of the plain-tiff, contained in his paper of the 29th of *September*, was also read to the jury.

The judge, in his charge to the jury, stated, that in his opinion, the defendant had been guilty of publishing the libel, as charged in

the plaintiff's declaration; that the amount of damages would much depend upon the fact, whether the publication, as extracted from the *Public Advertiser*, was a mistake, or intentional; that is, whether the defendant, at the time of the publication of the libel, knew that the extract from the *Evening Post*, by the editor of the *Public Advertiser*, was incorrect; that this was a matter of fact for the jury to determine.

The jury found a verdict for the plaintiff, for 1,500 dollars damages.

A motion was made to set aside the verdict, and for a new trial, on the following grounds:

1. That the judge ought to have nonsuited the plaintiff;

2. That the testimony of *North*, as to what he heard *Stanley* say to the defendant, ought to have been admitted;

3. That the jury ought to have been charged to find a verdict for the defendant; or if for the plaintiff, to find no more than nominal damages, as the publication by the defendant was made under a mistake of the fact.

*Foot*, for the defendant.

*Van Vechten*, contra.

KENT, Ch. J. The defendant moved for a new trial upon the following grounds:

1. That the plaintiff ought to have been nonsuited at the trial.

2. That the testimony of *Samuel North*, as to what he heard *Stanley* say, ought to have been received.

3. That the jury ought to have been directed to find for the defendant, or at most but nominal damages for the plaintiff, because the publication was made under a mistake of the fact.

The declaration states, by way of inducement to the libel, that the defendant maliciously intending to bring the plaintiff into public scandal, and to cause it to be believed that he had been guilty of treason, and of promulgating treasonable sentiments, &c. published the libel. The counsel stated that these were averments requisite to have been proved upon the trial, and that for want of showing the existence of the charge of treason, the plaintiff ought to have been nonsuited. The answer is, that they are not such averments, but suggestions stated as mere inducement to the libel. It was not traversable matter any more than the ordinary preliminary suggestions in a declaration in slander, that the plaintiff is of good

name, fame, &c. The averments requisite to give meaning and application to the libel, must be proved, and were proved in this case. The meaning of the libel, and its application to the plaintiff, were apparent on the face of the paper, and all that was required to support that meaning and that application, was the production of the paper, and the proof of its publication. The meaning imputed to it in the declaration, when the true meaning of the libel, and not the mere inducement to it, is averred, was obvious from the paper itself.

2. The next point is, that the testimony of *Samuel North* ought to have been received, when he offered to prove that he heard the defendant ask one *Henry Stanley*, who resided in *New-York*, whether he recollected the extract, as published in the *Public Advertiser*, appearing in the plaintiff's paper, to which *Stanley* replied, that he did. This point appears to me to be as untenable as the other.

The cases which are the most analogous, are those which were cited from *Binney's Reports*. In *Kennedy* v. *Gregory*, (1 *Binney*, 85.) it was held that the defendant, in an action of slander, might give in evidence, in mitigation of damages, that a third person told him what he related. But it ought to be observed, that in that case the person who gave the information, was the witness offered to prove it. So in the case of *Morris* v. *Duane*, (1 *Binney*, 90. *note*,) the defendant was allowed to give in evidence, in mitigation of damages, in an action for a libel, a paper containing the libellous charge, which had been in possession of a preceding editor, then dead, and to whose paper the defendant had succeeded as editor. These decisions are certainly entitled to great respect. Perhaps, they have even extended the *English* rule; and they would have applied, if *Stanley* himself had been offered as a witness to prove his disclosure to the defendant. But to resort to a bystander to prove what *Stanley* might have told the defendant, when *Stanley* was within the reach of the defendant, and could have been produced, is going beyond the cases cited, and would be a dangerous relaxation of the rules of evidence. The established doctrine is, that you must go, if you can, to the source of testimony, and not introduce a copy, when the original is to be had, nor undertake to prove what another person has been heard to say, when that person is a good witness, and can be produced. The testimony of *North*, though not, technically, hearsay evidence, is liable to the same objections; for it is resorting to an inferior or

secondary species of proof, without necessity; and, permit me here to add, that no one thing, in the administration of public justice, concerns more seriously the security of life, liberty, and property, than a firm disposition in the courts to adhere to the established rules of evidence. Why not produce *Stanley* to testify what he told the defendant, instead of resorting to a bystander who heard what he said? The latter evidence cannot be relied on, as equally original and accurate. *Stanley* knew what he meant to communicate, which the other could not know. *North* might not have heard correctly what he did say, or all that he said. Another part of the conversation which preceded or followed, might have explained the words which *North* heard, or varied their meaning. *North* might have misunderstood *Stanley*, or not have known whether he was in earnest, or was so understood by the defendant, or whether the conversation was or was not the result of a previous agreement between the defendant and *Stanley*, for the very purpose of providing for this case. Hearsay testimony is, from the very nature of it, attended with all such doubts and difficulties, and it cannot clear them up. " A person who relates a hearsay, is not obliged to enter into any particulars, to answer any questions, to solve any difficulties, to reconcile any contradictions, to explain any obscurities, to remove any ambiguities: he intrenches himself in the simple assertion that he was told so, and leaves the burden entirely on his dead or absent author." It is against sound principle, and would at once awaken distrust, for a party to resort to a secondary species of evidence, so long as the original and primary evidence exists and can be produced. The plaintiff, by means of this species of evidence, would be taken by surprise, and be precluded from the benefit of a cross examination of *Stanley*, as to all those material points which have been suggested as necessary to throw full light on his information. The testimony of *North*, as to what he heard *Stanley* say, could not afford the degree of proof which the fact might allow, nor admit those inquiries which conduce to a full and satisfactory explanation of what was related, and it was therefore properly rejected.

3. The last point is, that the damages ought to have been nominal only, because the publication was made under a mistake of the fact. The *quo animo* with which the libel was published, was altogether a matter for the consideration of the jury; and the circumstances which might tend to aggravate or extenuate the damages, and lessen or increase the degree of malice which the law

ALBANY,
Jan. 1812.

COLEMAN
v.
SOUTHWICK.

imputes to the publication of every unjustifiable libel, were no doubt urged to the jury upon the trial, as they have since been presented to this court, upon the argument of the present motion. The question of damages was within the proper and peculiar province of the jury. It rested in their sound discretion, under all the circumstances of the case, and unless the damages are so outrageous as to strike every one with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted from prejudice, partiality or corruption, we cannot, consistently with the precedents, interfere with the verdict. It is not enough to say, that in the opinion of the court, the damages are too high, and that we would have given much less. It is the judgment of the jury, and not the judgment of the court, which is to assess the damages in actions for personal torts and injuries.

We can judge better of the legal and constitutional effect of a verdict, in a case like this, by recalling to our attention some of the adjudged cases.

In *Hawkins* v. *Sciel*, 20 *Jac.* I. (*Palm.* 314.) the plaintiff recovered 150*l.* in slander, for calling him a bankrupt, and the court thought 50*l.* enough; but, upon solemn advice, they would not reduce the damages, nor change the course of the law, and resolved that it was better to leave such matters to the jury. The case of *Townsend* v. *Hughes*, 23 *Car.* II. (2 *Mod.* 150.) was an action of *scandalum magnatum*, and the jury gave 4,000*l.* damages. A motion was made for a new trial, on account of the excessive damages; but the court denied the motion, and said that the jury were the judges of the damages; and one of the judges observed, " suppose the jury had given a scandalous verdict for the plaintiff, as a penny damages, he could not have obtained a new trial in hopes to increase them, neither shall the defendant in hopes to lessen them." If the court could not say that these damages were excessive, they can hardly say so in any case of slander, and yet the court of C. B. of which Lord *Camden* was one, observed, near a century afterwards, that that case had never been contradicted or denied to be law. In *Roe* v. *Hawkes*, 15 *Car.* II. (1 *Lev.* 97.) the court made the like decision, where the damages, in a common case of slander, were 700*l.* These were old cases, and Lord *Camden* says, (2 *Wils.* 249.) that there seemed to be only one case before his time where a new trial was granted in actions for *torts*, and that was the case of *Chambers* v. *Robinson*, (1 *Str.* 691.) where the jury gave 1,000*l.* damages in an action for a malicious prosecution. And he observed, that the court

were free to say, *that* case was not law, as the reason assigned for the new trial, which was to give the defendant a chance of another jury, would be digging up the constitution by the roots. But in the early part of the reign of *Geo.* III. and prior to our revolution, there is a series of cases relative to the power of the jury over the damages, in actions for *torts,* which are more interesting, because, while they support with just spirit and firmness the constitutional prerogative of the jury, they define the limits of their power with greater precision, and settle it upon sound principles. The courts say there is a great difference between cases of damages which can certainly be seen, and such as are ideal, as between *assumpsit, trespass for goods, &c.* where the sum and value may be measured, and actions of false imprisonment, malicious prosecution, slander, and other personal *torts,* where the damages are matter of opinion. The law has not laid down what shall be the measure of damages in actions of *tort.* The measure is vague and uncertain, depending upon a vast variety of causes, facts and circumstances, as the state, degree, quality, trade, or profession of the party injured, as well as of the party who did the injury. The court cannot interfere, unless the damages are apparent, so that they can properly judge of the degree of the injury. Generally, in such cases, they cannot say whether 500*l.* was too much, or 50*l.* would have been too little. The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line ; for they have no standard by which to ascertain the excess. These are the principles which have been laid down by the most eminent judges who have presided in the *English* courts, since the year 1760; and by which they have uniformly governed themselves in cases in which the damages would appear to have been, beyond all comparison, more excessive than in the present case. (*Leeman* v. *Allen,* 2 *Wils.* 160. *Boardman* v. *Carrington,* 2 *Wils.* 244. *Wilford* v. *Berkley,* 1 *Burr.* 609. *Redshaw* v. *Brook,* 2 *Wils.* 405. *Bruce* v. *Rawlins,* 3 *Wils.* 60. *Huckle* v. *Money,* 2 *Wils.* 205. *Leith* v. *Pope,* 2 *Black. Rep.* 1327. *Gilbert* v. *Bartenshen, Cowp.* 230. *Duberley* v. *Gunning,* 4 *Term Rep.* 651.) In one case, in an action for *crim. con.* the jury gave 5,000*l.*; and Lord *Kenyon* said, he would have been satisfied if only nominal da-

ALBANY,
Jan. 1812.

COLEMAN
v.
SOUTHWICK.

images had been given, yet he knew of no case that would authorize the court to interfere, and he said he had not courage enough to make the first precedent. The doctrine contained in these cases has been acknowledged to be sound law, and has been adopted and sanctioned by the supreme court of *Massachusetts*, in the case of *Coffin* v. *Coffin*, (4 *Tyng*, 1.) and by this court, in the case of *Tillotson* v. *Cheetham*, (2 *Johns. Rep.* 63.)

There is no pretence to say, that the amount of the verdict, in the present case, is so extraordinary and extravagant, as to justify the court, under the above cases, to set it aside. The precedent would be new and dangerous.

I am accordingly of opinion, that the motion, on the part of the defendant, be denied.

THOMPSON, J. and VAN NESS, J. were of the same opinion.

SPENCER, J. I am under the necessity of differing from a majority of the court, upon the competency of *Samuel North*, to prove the information given to the defendant by *Stanley*. I concur in the opinion, that the plaintiff ought not to have been nonsuited on the ground taken by the defendant's counsel. I shall not enter upon the question of excessiveness of damages, and desire to be understood, as neither denying or supporting the doctrine advanced by a majority of the court upon that point, as applicable to the case before us.

The only point I mean to discuss or decide is this ; was *North* a competent witness to prove the declarations made by *Stanley* to the defendant?

I understand my brethren to concede, that had *Stanley* himself been offered as a witness to prove the same facts, he would have been admissible to prove them. Of this I think there can be no doubt.

Upon a consultation of the twelve judges in the case of *Smith* v. *Richardson*, (*Willes*, 20.) it was agreed, that in actions of slander, malice was the *gist* of the action, and that evidence showing the manner and occasion of speaking the words, and that they were not spoken maliciously, had always been admitted, and that what could not be pleaded, might be given in evidence, in mitigation of damages. By a parity of reasoning, this doctrine equally applies to actions for libels ; at all events, so far as respects the question of damages. To the same point may be cited the opinion of Chief Justice *Tilghman*, (1 *Binney*, 90.) which I consider entitled to great respect, from the high legal reputation of that distinguished judge.

*Stanley's* declarations to the defendant were offered to be proved, with the view of showing to the jury, that the defendant had an additional motive for believing that the publication, which was the foundation of the suit, and extracted from the *Public Advertiser*, had been, in fact, published in the plaintiff's paper.

This evidence was offered, to show *quo animo* the defendant republished the extract. If *Stanley's* information to the defendant induced him to believe the extract he published had been published in the plaintiff's paper, then it went so far to show that his intention in the republication was not malicious.

It is perfectly immaterial whether *Stanley* stated to the defendant the truth or not. The question is, did he make the statement, and had the defendant a right to believe him. The impression actually existing on the defendant's mind, at the time of the publication, was the *gist* of the inquiry.

Now if *North* was present, and could swear (and he was offered for that purpose) that he heard the defendant make the inquiry of *Stanley*, whether he had seen the extract, published in the *Public Advertiser*, in the plaintiff's paper, and heard *Stanley* say he had, *North* is as competent a witness to prove that conversation as *Stanley*. I repeat it, the point of the inquiry was, under what impressions did the defendant publish the libel.

The mistake into which the plaintiff's counsel have fallen is this: they have considered *North* as coming to prove a fact by hearsay, overlooking the circumstance, that the fact to be proved, was the state of the defendant's mind when he published the libel. The rule of law excluding hearsay evidence does not apply to this case. When a fact is to be made out, it must be proved, either by direct evidence of the existence of the fact, or by circumstances which go to establish the fact, and there hearsay is inadmissible, in general. Here *North*, if he heard the question and answer, is an original witness, as to the fact offered to be proved. He could relate the question and answer, as well and as faithfully, for aught we know, as the person who held the conversation.

The defendant's counsel, in offering to prove by *North* what *Stanley* said, did not offer it as evidence to prove the fact that *Stanley* had seen the extract in the plaintiff's paper, but only to prove that the defendant had been so informed, and was influenced by that information.

An agent who makes a bargain, may be a witness for or against the principal, in relation to the terms of the bargain; but if it be proved that he was an agent for the party, what he said in relation

to the contract may be proved by any one, on the principle, that his words being part of his acts, are admissible against his principal. (*Peake*, 18. 7 T. R. 668.)

There is no force in the objection, that *Stanley* is a better witness than *North*; for aught we know, *North* might have stated that he went with *Stanley* to the defendant's, that he remained constantly by his side, that he heard all that was said, and that he went away with him. To indulge the idea that the conversation was the result of preconcert, is presuming immoral conduct in the defendant or *Stanley*, and is against that benign principle of law, that *odiosa non sunt præsumenda.*

*Stanley* was as much in the power of the plaintiff as of the defendant, and if the conversation was the result of artifice, the plaintiff might have called him to prove it.

I am fully satisfied that *North's* testimony ought to have been admitted, and that for this cause, there should be a new trial, with costs to abide the event of the suit.

YATES, J. was of the same opinion.

Motion denied.