## CHELLIS v. CHAPMAN.

### (Supreme Court, General Term, Fourth Department. April, 1889.)

1. BREACH OF MARRIAGE PROMISE—EVIDENCE—WEALTH OF DEFENDANT.
    In an action for breach of promise of marriage, the pecuniary circumstances of defendant may be shown by general reputation.

2. SAME—CROSS-EXAMINATION OF PLAINTIFF.
    Where plaintiff on cross-examination has testified that she was then unwilling to marry defendant, she may testify on re-examination to the reason of her unwillingness.

3. SAME—STATEMENTS TO THIRD PERSONS.
    One whom defendant has requested to communicate his matrimonial wishes to plaintiff, may testify that she communicated to plaintiff the conversation with defendant.

4. SAME—FORMER ENGAGEMENTS—HARMLESS ERROR.
    Allowing defendant to be asked on cross-examination, "Were you ever engaged to marry any other woman aside from" plaintiff? is harmless error, when he answers in the negative, saying: "Never had any real settled engagement; no more than talk from one time to another; no bargain made."

5. WITNESS—PRIVILEGED COMMUNICATIONS—ATTORNEYS.
    Compelling defendant to testify whether he gave to his counsel all the letters received from plaintiff is not contrary to Code Civil Proc. N. Y. § 835, which prescribes that the attorney "shall not be allowed to disclose a communication made by his client to him, or his advice given thereon, in the course of his professional employment."

6. SAME—CONTRADICTIONS.
    Defendant may be asked on his cross-examination to explain statements in his testimony contradicting his answer to the complaint.

7. BREACH OF PROMISE OF MARRIAGE—EVIDENCE.
    Where the answer charges that plaintiff was never attached to defendant, and evidence has been adduced to sustain the averment, plaintiff may testify that she was attached to defendant.

8. SAME—INSTRUCTIONS—MOTIVE.
    A charge that the jury may allow punitive damages in their discretion, if they find that defendant was actuated by dishonest motives, is not erroneous.

9. SAME—DAMAGES—EXCESSIVE.
    In such an action, where defendant was a farmer of some means, 74 years of age, and plaintiff was 46, and had given up a position as principal of a public school at defendant's request, a verdict for $8,000 will not be set aside as excessive. MERWIN, J., dissenting.

Appeal from circuit court, Jefferson county.

Action by Sarah S. Chellis against John B. Chapman, for a breach of promise of marriage. In addition to several denials contained in the answer, the defendant alleged that he was of the age of 74 years, and was never married; and "that since the date of the alleged promises set forth in the complaint, to-wit, since about September, 1886, he has been and still is in very feeble health, so as to be more or less prevented from continuing or carrying on his ordinary business, having been and still being afflicted with rheumatism, with a disease of his kidneys, and 'fits,' whereby he has suffered and still suffers great bodily pain, is bent over so that he cannot stand erect, and is lame; that when attacked by said 'fits' he falls prostrate and so remains for a long space of time. * * *" His answer also alleges "that the plaintiff resides in a city, is fond of and accustomed to dress, gayety, luxury, and much society, and is unfamiliar with and has no taste for the hard labor and solitude of a farmer's wife in the country; that the defendant is, and has been all his life, a farmer residing in the country remote from any large town, and of plain dress, simple and economical habits, and but little inclined to society; that the plaintiff and defendant are not suited to each other so as to make the relation of husband and wife desirable, but, on the contrary, the disparity of age, occupa-

tion, education, habits, and tastes is such as to make the marital relation intolerable to either; that, as defendant is informed and believes, the plaintiff has not now nor ever had any affection for him, nor any desire that she should ever become his wife, and that her only purpose was and is to procure money of defendant on the pretense that he had promised to marry her, and then been guilty of a breach thereof."

Plaintiff was a maiden 46 years of age, and had for several years been a school-teacher in the public schools in the city of Watertown. She had been principal of the Cooper-Street school from 1879 to 1886, which position she resigned in August, 1886, at the request of the defendant. She first became acquainted with the defendant in December, 1880, or January, 1881. He visited her then in the city of Watertown, at her home, and he said to her that he had called because he had been recommended to do so, and he stated to her "he would like to form her acquaintance." In the summer of 1881 he visited her and remained two or three hours at a time, and she testifies that on one occasion "he said to me that he wished a wife; he wished some one to love him,—one for a companion. Asked me if I could be happy in the country after living in town. In reply to that I said: 'I like the country, but I know very little, if anything, about farming, and there would probably be a good many kinds of work connected with farming that I would know very little about.' I also said I didn't think it would be best, as there seemed quite a difference in our ages. In reply to that he said he didn't think it need make any difference about our ages. He thought we could be happy together for all that; and he said that the work he cared nothing about. He said he did not want a wife for the work she could do. And then he said: 'Leave the question, but if you change your mind and think you can live with me, let me know, and we will not talk about it in the mean time.'" He visited her again in June, and she testifies, viz.: "I remember an occasion in June, 1886, when he visited my house. At this visit in June, 1886, he asked me if I had changed my mind in regard to the question. He said again he wanted a wife; wanted some one to love him; wanted a companion. He said no matter what troubles came up, if a man had a loving wife, he could get along with all such. I said I had thought more favorably of it, and had changed my mind and decided to marry him. And he talked about his home, and about his house; told of the different rooms; how they were arranged. He spoke about its being in the country, and told where it was located more particularly. He said he could make it very happy for me if I went to his house. I don't think of anything else he said upon the subject upon this occasion. He remained there some three or four hours on this occasion. He came in the morning and stayed until after dinner. He took dinner at my house. On this occasion there was not any time fixed when the marriage was to be performed. I next saw him after that in July. I don't think I saw him again during June. I saw him in July at my home again. I then told him I had accepted my appointment as teacher, and he urged me to send in my resignation. * * * The substance of what he said was that he wished me to send in my resignation and be married in September. He spoke of his house again. Told me of the different rooms, and how they were arranged. And he said he was going to have his house repainted in September. I asked him about the size of his parlor, as I wished to get a carpet for it. I told him I wanted to furnish some rooms myself. He told me he didn't know the size of the room. He would send me the dimensions, which he afterwards did do. I afterwards received a letter from him in which he gave what he said was the size of his parlor. I preserved a part of the letter. The room was 15-7 by 13-8." Plaintiff further testified: "It was during July that he fixed upon the time. On one of his visits during July, we settled upon the day. We fixed upon the 15th of September as the day when this marriage was to take place. It was about that time that the letter containing the size of the rooms for which I was to get a

carpet was received. * * * He said he was very busy. He was building a barn. That his other work made him very hurried, and said another week would be more convenient for him. It would give him a little more time for his work. I said I would as soon it would be deferred another week. He and I finally fixed upon the 22d of September, one week from that time, as the time when the marriage should take place. I said that we would have no guests at the wedding. We would invite but very few guests, if any. We would have a very private, or very quiet, at least, wedding." She detailed the preparation she had made in preparing her wardrobe, bedding, and some things necessary for housekeeping. On one of his visits to her in July or August, "he brought a suit of clothes for himself, which he said was to be his wedding clothes. He said it was not convenient for him to take them home with him then. He would like to leave them at my house for a while, and he did so. He showed the suit of clothes to me when he first brought them. He left them there." When the 22d of September arrived, and the plaintiff was in readiness to carry out the contract on her part, the defendant failed to appear. He sent her a letter, however, in which he claimed that he had injured one of his eyes, as his reason for not appearing, "but should be there in a few days, just as soon as he was able to come. I don't know the date the letter was written. I received it on the morning of the 22d." Other evidence was given tending to show the contract between the parties and the breach thereof, and the circumstances attending the failure of the defendant to carry out the contract on his part. When the defendant was upon the stand as a witness, he did not dispute the engagement to the plaintiff.

Defendant appeals from a judgment entered on a verdict for plaintiff for $8,000, and from an order denying a motion for a new trial on the minutes.

Argued before HARDIN, P. J., and MARTIN and MERWIN, JJ.

*L. E. Pruyne*, for appellant. *Porter & Walts* and *Hannibal Smith*, for respondent.

HARDIN, P. J. Abundant evidence was given at the trial to establish the contract between the parties, and the breach thereof by the defendant. Appellant's learned counsel claims that several errors were committed during the progress of the trial which should lead to a reversal of the judgment. We will proceed to examine them.

1. Appellant insists that it was error to allow the pecuniary circumstances of the defendant to be shown by general reputation. The objections taken to that class of evidence were as follows: "(1) Incompetent. (2) Not proper evidence upon the subject of damages in an action for breach of promise of marriage." We think this court is so far committed upon the question that it is not open for further examination in this court. *Crosier* v. *Craig*, 47 Hun, 84, opinion of FOLLETT, J., and cases there cited. See, also, *James* v. *Biddington*, 6 Car. & P. 589; *Hall* v. *Wright*, 96 E. C. L. 765.

2. During the plaintiff's re-examination she was asked, viz.: "Was it after reading defendant's answer that you decided that you would not care to marry him?" This was objected to, and the objection overruled. She answered: "After reading it, and thinking of it, I made up my mind I didn't want to marry him." Then she was asked, "When you say now, or at this time, rather, in answer to Mr. Rogers' question, ʻI am not willing to marry him,ʼ what are the reasons for that answer?" This was objected to by the defendant as incompetent and immaterial. The court thereupon remarked, "I think I will let her answer in answer to your cross-examination." Thereupon the defendant excepted, and she answered: "Because he has shown himself without any honor, and false in every respect." Then there was a motion made by the defendant to strike out the answer as incompetent and immaterial; a statement of the opinion of the witness, and not any fact. Thereupon the court remarked, viz.: "It is not offered for the purpose of establishing he has not been honorable,.

but simply what the ground in her mind is, or what there is in her mind which induces her now to be unwilling to marry him. It is not proof of the fact that he was not honorable, or any expression of opinion upon the subject." Thereupon the following question was propounded: "That is what you mean, not that he is not so, but you so regard him as not honorable and false since the service of the answer?" The witness answered: "That is the impression that his conduct has made upon my mind." The counsel for the defendant asked if his motion was denied, and the court said "Yes," and the defendant took an exception. Thereupon the counsel for the defendant moved "to strike out the statement that his conduct had been such that it had made that impression on her mind." Thereupon the court remarked: "I will allow that to stand, I think;" and thereupon the defendant took an exception. We think there was no error in the rulings. In the cross-examination the plaintiff had been pressed to say whether she was then willing to marry the defendant, and she had then declared that she was not, and we think all the facts which she stated in her redirect examination were allowable in giving an explanation of why she was then unwilling to consummate the marriage contract with the defendant. The defendant voluntarily sought during the trial to probe her then mental condition in respect to the defendant. Having pressed her to declare her position, it was not improper that she be permitted to give the reasons for the then condition of her mind on the subject of intermarriage with the defendant.

3. It appeared that the defendant held several conversations with Mrs. Fitch, a sister of the plaintiff, upon the subject of his proposed intermarriage with the plaintiff, and that he had asked Mrs. Fitch to intercede for him; and on one occasion he asked Mrs. Fitch if she had had a talk with the plaintiff. Mrs. Fitch replied, "I had, but had not found out much." Thereupon the court asked Mrs. Fitch: "When you had this long talk that you have detailed with Mr. Chapman when your sister was down at Adams, when your sister came home did you say anything to her, and, if so, what with reference to Mr. Chapman?" That question was objected to by the defendant as incompetent and immaterial, and a declaration of the witness, no statement of any fact by which the defendant can be bound. The court overruled the objection, and the defendant took an exception. The answer given to that question was as follows: "I think I told her about word for word, as near as I can remember, just what he said, and about what I told him about his sisters, and about his not dressing well and being stingy. I had a good many talks with him upon the subject of my sister, at my house, on occasions when my sister was absent. I don't think we ever talked when she was there, but he came a good many times when she would go to school before he left, and then he invariably stopped and talked with me a while. He would say, 'I think, Mrs. Fitch, you are my friend, and I think you will do all you can for me,' something to that effect." The defendant made a motion to strike out the last sentence. The court refused, and the defendant took an exception. The principal evidence involved in the last answers of the witness had already been stated by her in narrating the conversation which she had held with the defendant, and as he had asked Mrs. Fitch to intercede for him, and to communicate his wishes to the plaintiff, we think no error was committed in allowing Mrs. Fitch to state that she had communicated to the plaintiff the details of the conversation she had held with the defendant, and that the rulings had were not erroneous.

4. In the course of the cross-examination of the defendant, he was asked, viz.: "My question is, were you ever engaged to marry any other woman, aside from Miss Chellis?" An objection and exception were taken by the defendant. According to the ruling of the court it was regarded as a part of the cross-examination, and as bearing upon the witness' *status;* however, as the witness answered, in effect, that he had not been engaged, saying, viz.:

"Never had any real settled engagement; no more than a talk from one time to another; no bargain made," we think he was not required to give any evidence that was so prejudicial to the defendant as might cause a reversal. He did not admit that he was "much of a Lothario."

5. While the defendant was being examined, he was asked in respect to certain letters which he had received from the plaintiff. He was required by the court to state in respect to those letters. He did state that according to his best judgment he saved them, and that he "picked them up, what I could find," and gave them to Mr. Pruyne." And he added: "I don't know how many letters I delivered to Mr. Pruyne. I intended to and did deliver all I could find. I am inclined to think I destroyed one letter written in pencil two or three years before the engagement. If I did receive any after the engagement, I have forgotten it. If I did, I saved them. I don't know where they are. I don't know as they exist anywhere, or ever did." Then he was asked: "If you received any they are with this bunch which you delivered over to your lawyers?" That question was objected to, and exception taken, and the witness answered, "Yes, sir. I should think they had read in evidence all the letters which I gave to Mr. Pruyne. I don't know of any that they have not read. I don't know of any that I had that I did not give him. I didn't deliver to Mr. Pruyne letters of a later date than May 17, 1886, to my knowledge. I picked up all I could find and gave them to him. I wrote to her after the engagement. It is my opinion that I received replies to those letters, but am not certain. I don't know how many. I think two or three, or more or less, but am not certain. I think I put them in the drawer with the rest of my other papers. I have no recollection of destroying but one, and am not certain about that. I put them in loose in a drawer. Had more than a bushel other papers in there." "*Question.* Did you take those letters that you received after your engagement with the others, and deliver them to your attorney?" This was objected to as privileged; overruled, and the defendant excepted. The witness answered: "I don't recollect. It has gone from my knowledge. I can't tell much about it. I picked up all I could find of them and gave them to Mr. Pruyne. I don't know whether there are other letters that have not been read or not." We think the rulings do not violate the privilege in respect to conversations and transactions between the attorney and client, and that the plaintiff was entitled to exhaust the witness' recollection in respect to the letters which were the subject of inquiry. We see no satisfactory ground upon which the rulings can be disturbed. Section 835 of the Code of Civil Procedure, referred to by the counsel for the appellant, prescribes that the attorney "shall not be allowed to disclose a communication made by his client to him, or his advice given thereon, in the course of his professional employment." It does not, however, shield the party from a disclosure of the facts relating to his parting with letters which are the legitimate subject of inquiry.

6. Complaint is made of the course the examination took in respect to the defendant's statements in his answer, and his statements upon the stand as a witness, and the pressure put upon him to explain why the contradictions found in his testimony of certain positions taken in his answer. We are of the opinion that the latitude indulged by the trial judge was not an abuse of his discretion, nor was it beyond the practice which has been tolerated quite generally in the progress of the trial.

7. During the examination of the plaintiff as a witness the following question was propounded to her: "*Question.* During these years he visited you, and down to the time of your engagement, or promise to marry him, in June, 1886, you may state whether or not you became attached to him." A general objection was taken to this, and the court remarked: "I think that is proper. To state what her feelings became towards him." Thereupon the defendant excepted, and the witness answered, viz.: "*Answer.* I certainly was, or I

should not have agreed to have married him. During his visits—after the engagement to marry him—he had kissed me. 1 think that occurred before the engagement as well as after. I was ready at the times agreed upon to marry him on my part, and desired to do so."

We think the facts disclosed in answer to the question were entirely legitimate, and that they were pertinent and proper, inasmuch as the defendant in his answer had set up, viz.: "The plaintiff has not now nor ever had any affection for him, nor any desire that she should ever become his wife, and that her only purpose was and is to procure money of defendant on the pretense that he had promised to marry her, and then been guilty of a breach thereof." Considering that language found in the answer, and also considering the evidence which the defendant offered, with a view of having the position taken in his answer believed to be a just one, we think the plaintiff was entitled to the evidence which she gave in answer to the question objected to, and that the defendant's exception to the ruling, allowing such evidence to be received, is unavailing.

When *McKee* v. *Nelson*, 4 Cow. 355, was decided, the parties to a marriage contract could not be witnesses for or against each other, and evidence in respect to the apparent attachment existing between the parties was allowed, and the court remarked, viz.: "It is true, as a general rule, that witnesses are not allowed to give their opinions to a jury; but there are exceptions, and we think this one of them. There are a thousand nameless things indicating the existence and degree of the tender passion, which language cannot specify. The opinion of witnesses on this subject must be derived from a series of instances passing under their observation, which yet they never could detail to a jury." In commenting upon that case, SELDEN, J., says in *De Witt* v. *Barly*, 17 N. Y. 344: "That was an action for breach of promise of marriage, and a witness, who knew the plaintiff, and had observed her conduct and deportment towards the defendant, was permitted to testify whether, in her opinion, the plaintiff was sincerely attached to him, a fact which it is plain could be proved in no other way."

We find nothing in either of the cases which warrants us in condemning the ruling which allowed the plaintiff to state the fact that she "became attached to him."

8. It is contended by the defendant that the court "erred in submitting to the jury the question of exemplary damages." At the close of the charge, the defendant's counsel took an exception in the following language: "I except also to submitting the question of punitive damages to the jury at all in this case." In the course of the charge the learned trial judge said: "The law is well settled now that juries may in their discretion—you are not compelled to—that juries may in their discretion, in a proper case, allow what are known as exemplary or punitive damages, and this is the only kind of action on a contract where that kind of damages can be allowed. Ordinarily, such damages are allowed in cases of wrong, slander, libel, malicious prosecution, and that kind of actions where a wrong has been committed, but in no other action on a contract, except breach of promise, can this kind of damages be allowed; and I say, gentlemen, before reaching the decisions which I propose to read, to show you the rule to be applied,—this kind of damages in any case the jury are not compelled to give,—it is a matter of discretion with the jury in a proper case whether they shall give them. There are some cases of breach of promise of marriage in which a jury would not be justified in giving punitive damages; but in a case where you are justified in doing it, whether you will do it at all, or to the extent to which you will allow these damages, is a matter of discretion with you. I read you a few passages of the law as found in 42 N. Y., commencing page 477, ' as to the measure of damages this action [this is an action for breach of promise] has always been classed with actions of torts, as libel, slander, seduction, criminal conversation, etc., and

not without reason. It is the policy of the law to encourage matrimony, and society has an interest in contracts of marriage, both before and after they are consummated. A man who enters into a contract of marriage with improper motives, and then ruthlessly and unjustifiably breaks it off, does a wrong to the woman, and also, in a more remote sense, to society, * * * as well as the man who commits a tort under circumstances showing a bad heart. The rule of damages applicable to ordinary contracts would be wholly inadequate. So much depends in each case upon the circumstances surrounding it, and upon the conduct, standing, and character of the parties. In all cases where vindictive damages are allowed, it is upon the theory that the defendant's conduct has been such that he deserves to be punished; and with a view of measuring out punishment to him, as well as compensation to the plaintiff, it is always competent to inquire into his motives and intentions, to show that the act complained of was done wantonly, insolently, maliciously, or with a bad and wicked heart. In such actions it is not only proper to show the main transaction, but any facts bearing upon or relating to it, showing it was done wantonly, maliciously, and wickedly, with a view of enhancing the damages. * * * In an action for breach of promise of marriage, it is always competent for the purpose of enhancing the damages to prove the motives that actuated the defendant; that he entered into the contract, and broke it with bad motives and a wicked heart, and it is competent for him to prove in mitigation of damages that his motives were not bad, and that his conduct was neither cruel nor malicious.'" He also quoted quite extensively from *Johnson* v. *Jenkins*, 24 N. Y. 253. He then added, viz.: "Exemplary or punitive damages, to which I have just called your attention, are in your discretion. Not wholly in your discretion. You have not an arbitrary right to fix what you please, or to fix them at all. You must believe, in the first place, in order to permit you to award punitive damages at all, that the defendant either entered into this contract originally dishonestly, without any idea of carrying it out, for a bad purpose, and perhaps I may say there is no evidence of that here. When he entered into the contract, so far as appears here, he seems to have been in earnest about it, and, if that be so, then you can only allow exemplary damages in this case, provided you believe there was something which actuated him, some bad motives, bad purpose, or bad design in the manner of the breaking of it off. If he thought, when he came down to the time when he was called upon to marry this woman, being honest down to that time,—if he then thought that his condition of health was such that he ought not to carry out his contract, and then in breaking it he did nothing unduly to oppress the plaintiff, withdrawing from it or avoiding it as easily as he could, and with as little trouble to the plaintiff as possible,—then, gentlemen, you would not be justified in punishing him for it. He is liable for compensatory damages fully, no matter what his motives were. Having made the contract, if he has violated it, whatever will fully and fairly compensate the plaintiff she is entitled to anyhow, without reference to his motives. The question of his motives bears only upon the question as to whether you shall allow any, and, if so, what, exemplary or punitive damages; and you should not allow those—you haven't any right to allow them—in a case where the original contract was made with good intentions, unless there was something in the manner of the breach of it which was malicious, which was from bad motives, or there was some act of his which was particularly oppressive to the plaintiff in the manner of his avoiding the provisions of the contract."

We are of the opinion that the question of damages, compensatory and punitive, was properly and clearly submitted to the jury by the learned trial judge. *Hunt* v. *Bennett*, 19 N. Y. 173; *Johnson* v. *Jenkins*, 24 N. Y. 252; *Thorn* v. *Knapp*, 42 N. Y. 474; Sedg. Dam. (6th Ed.) 248, 455.

Nor do we think the damages given by the jury are excessive, or that the amount indicates that the jury was "influenced by prejudice, passion, or cor-

ruption." Mr. Sedgwick says, at page 455: "This action is given as an indemnity to the injured party for the loss she has sustained, and has always been held to embrace the injury to the feelings, affections, and wounded pride, as well as the loss of marriage. From the nature of the case it has been found impossible to fix the amount of compensation by any precise rule, and, as in tort, the measure of damages is a question for the sound discretion of the jury in each particular instance, subject, of course, to the general restriction that a verdict influenced by prejudice, passion, or corruption will not be allowed to stand." It was said in *Thorn* v. *Knapp*, 42 N. Y. 474, that damages in this class of actions "have never been limited to the simple rule governing actions upon simple contracts for the payment of money." "For the breach of the contract of marriage, though in form of an action of *assumpsit*, is, in fact, and always has been since it was sustained at common law, in respect to this question of damages, really in the nature of an action for a tort." Page 483.

In *Minick* v. *City of Troy*, 19 Hun, 258, BOCKES, J., in referring to the case of *Coleman* v. *Southwick*, 9 Johns. 51, approves of the language of KENT, C. J., used in that case, wherein he says, viz.: "The question of damages was within the proper and peculiar province of the jury. It rested in their sound discretion, under all the circumstances of the case, and unless the damages are so outrageous as to strike every one with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted from prejudice, partiality, or corruption, we cannot consistently with the precedents interfere with the verdict. It is not enough to say that, in the opinion of the court, the damages are too high, and that we would have given much less. It is the judgment of the jury, and not the judgment of the court, which is to assess the damages in actions for personal torts and injuries."

In *Coppins* v. *Railroad Co.*, 48 Hun, 300, we had occasion to review the cases bearing upon the question of excessive damages, and to deduce therefrom the rule applicable to such cases, and while we interfered with the verdict in that case, there was wanting in it many of the elements which enter into the question of damages in the case in hand. In that case, there was no predicate for punitive damages. It was a case simply for compensatory damages.

In *Grant* v. *Willey*, 101 Mass. 356, it was held that the "time during which an engagement had subsisted is a proper circumstance for the jury to consider." And it was held in *Berry* v. *Da Costa*, L. R. 1 C. P. 331, that the "jury may take into account the plaintiff's altered social position, in consequence of the defendant's misconduct." And in *Smith* v. *Woodfine*, 1 C. B. (N. S.) 660, the language which we have quoted from Sedgwick on Damages was approved; and it was stated, viz.: "The jury are allowed to take into their consideration all the circumstances." In January, 1889, the general term of the First department sustained a verdict in *Campbell* v. *Arbuckle*, 4 N. Y. Supp. 29, for $45,000, in a case somewhat like the one before us.

In *Houghkirk* v. *Canal Co.*, 92 N. Y. 224, the power of the general term to interfere with the verdict on the ground that it is excessive is recognized and reaffirmed, and the court remarked that "while the judgment of the trial court should not be lightly disturbed, it should not be held necessarily conclusive."

After a full and deliberate consideration of all the circumstances disclosed in the evidence, and in the light of the precedents and rules of law to which we have already adverted, we are of the opinion that we ought not to interfere with the verdict on the ground that the same is excessive. Judgment and order affirmed, with costs.

MARTIN, J., concurred. MERWIN, J., concurred in the foregoing opinion, except upon the question as to the amount of damages.