### Chicago City Ry. Co. v. Emilie Bohnow, Adm'x.

1. VERDICTS—*Where They Will Not be Set Aside.*—Where there is a contrariety of evidence on both sides, and the facts and circumstances, by a fair and reasonable intendment, will warrant the inferences of the jury, courts will reluctantly, if ever, disturb their verdict, notwith-

Chicago City Ry. Co. v. Bohnow.

standing it may appear to be against the strength and weight of the testimony.

2.  SAME—*Action of Appellate Court Where the Evidence is Conflicting.*—Where the evidence is conflicting an appellate tribunal has no right to set aside the verdict of a jury and the judgment entered thereon, unless it is convinced that such verdict is manifestly against the weight of the evidence.

3.  EVIDENCE—*Province of the Jury to Weigh.*—It is the peculiar province of the jury to weigh evidence, and reconcile it, if possible; or, if that can not be done, then to decide according to the weight of the evidence, as it may appear to them.

4.  DAMAGES—*Where Amount Allowed by Jury Should be Final.*— There is no hard and fast rule by which damages in personal injury cases can be computed, and the verdict of the jury, unless the court can say that it was dictated by passion and prejudice and was not rendered in the exercise of their discretion and sound judgment, should be final.

5.  NEW TRIALS—*What Will Authorize, on the Ground of Newly-discovered Evidence.*—To authorize a new trial on the ground of newly-discovered evidence, it must appear that the evidence has been discovered since the trial, and that it could not have been produced on the trial by the use of reasonable diligence.   The evidence must also be material to the issue, and relate to the merits of the case.   And it must not be cumulative merely, nor go to impeach the character of a witness.

**Trespass on the Case.**—Death from negligent act.   Appeal from the Superior Court of Cook County; the Hon. PHILIP STEIN, Judge presiding.   Heard in this court at the October term, 1902.   Affirmed. Opinion filed June 18, 1903.

This is an action brought by appellee against appellant to recover damages for the death of her husband, who was killed by a car operated by appellant on July 31, 1900, at Wentworth avenue and Twenty-fifth street in the city of Chicago.

The first count sets up the relation of carrier and passenger and alleges that while deceased was on the car it was suddenly and violently slackened in speed, whereby he, while in the exercise of due care, was thrown from the car, etc.

The second count alleges that the car was overcrowded and that appellant carelessly, etc., caused said car to be suddenly and violently slackened in speed, whereby he was thrown therefrom, etc.

The jury returned a verdict finding appellant guilty and assessing the damages of appellee at the sum of $3,000. Judgment was entered thereon, to reverse which this appeal is prosecuted.

The evidence tends to prove that the decedent boarded the train at the intersection of Wentworth avenue and Twenty-fourth street in the early afternoon of the day in question; that at the time the trains on the line were running at frequent intervals and were crowded with passengers on their way to the baseball park at Thirty-fifth street and Wentworth avenue; that the train in question was composed of two open cars, a motor and a trailer; that all of its seats were filled, and passengers were standing on the platforms and running boards when decedent boarded it; that he had with him a sink, which he placed on the front platform of the trailer, and that he himself took his stand on the extreme front end of the running board, grasping with his right hand the rod running from the front dashboard to the step of the car, and standing with his back to the front and facing the inside of the car; that as the train approached Twenty-fifth street and before the conductor had reached him in his progress of collecting fares the decedent put his left hand in the rear pocket of his trousers for the purpose of getting his fare, and while in the act of so doing he swung around and fell in front of the car upon which he was riding. The evidence on behalf of appellee tends to show that as the train approached the Twenty-fifth street crossing there was a slackening of its speed and then a jerk backward, and that it was at that moment that the decedent fell. That on the part of the appellant is that the train as it approached the crossing was slowing down to stop at the corner for the reception and discharge of passengers; that the propelling power had previously been removed and the brake partially applied to that end; that suddenly some one screamed, and having been thus notified that something was amiss, the conductor gave the emergency signal to stop; that the brake was thereupon forcibly applied and the train brought to a stop, and that

up to that time it had been running along in the customary and ordinary way without any unusual or extraordinary movement.

The deceased at the time of his death was forty-two years old. The administratrix, his widow, and six children survive him.

WILLIAM J. HYNES, SAMUEL S. PAGE and WATSON J. FERRY, attorneys for appellant; MASON B. STARRING, of counsel.

HENRY R. RATHBONE, attorney for appellee.

MR. PRESIDING JUSTICE BALL delivered the opinion of the court.

To reverse the judgment in this case appellant relies upon the following points:

First. That the verdict is against the weight of the evidence.

It was not negligence *per se* for appellant to let the deceased take place upon the footboard, nor was it negligence *per se* for him to stand there. The situation did not absolve either from the duty of using due care.

To establish her case appellee called the following witnesses: Mrs. Sievers, who sat in the front seat of the trailer, within two feet of where the deceased stood on the footboard, in describing the accident, says:

"It (the car) kept kind of jerking backward, and then went right ahead with a second jerk, and the man fell under the car." "The first time the car gave a jerk he slipped backward and had his hand still on the handle of the car. Then it gave a jerk right again, going ahead again, and his hand got off the handle, and I seen him no more."

Ida Sievers, the daughter of the last witness, who sat by her mother, says:

"He (the deceased) had hold of it (the rod) with one hand, and with the other hand he went in his coat pocket to get out some fare, and the car jerked and I nearly slipped out of my seat. I held onto my ma's dress and then I heard my mamma scream and say that a man was under the car."

James J. Hastings, a city salesman who was on the motor car, testifies :

"There was a sudden jerking of the cars, and I heard a lot of women screaming." Question : "As to that jolt, was it forward or backward, or both, or how ?" Answer : "The same as if— a sort of chuck. I couldn't exactly state the force of it."

Charles D. Washburne, in the cooperage business, who sat beside Hastings, swears :

"I heard a woman scream, and just before that the car, it seems to me, had almost come to a sudden stop, and then very quickly started again."

John Prindiville, a teamster, who stood on the footboard, next back of deceased, says :

"Well, I saw the man get on the car and put the sink up to the front, and there was a lady sitting there and he made some remark to the lady. He stood on the side of the car, and he held onto the handrail of the front dashboard, and when the conductor came up he rang the bell for the car to stop and it stopped in a sudden, and at that he pitched around sideways with his hand in his pocket." "There were sudden jerks. It seemed to kind of go forward again after stopping like. It did not come to a full stop. The jerk was good and strong." Question : "How long before the man swung around did it (the train) begin to slow up ?" Answer : "From the north side of the street; and this was in the middle of the street where it came to a sudden stop and jerked ahead again."

The manner in which the deceased fell and the place where he fell (to the front and between the cars) is a circumstance in favor of the contention of appellee.

In defense of the action appellant called nine witnesses.

Ulrich Hartman, the conductor of the motor car, who gave the signal to stop at Twenty-fifth street, says the car commenced to slow down gradually; then came a scream, and he rang the emergency bell. "Up to the time that this screaming came there had not been any unusual motion of the car."

Charles Lockwood, the conductor of the trailer, who was standing on the footboard from which the deceased fell, says, up to the time of the scream he did not notice any

unusual motion of the car; there was no jerking of the car. After the scream the train stopped more abruptly.

Langohr, the motorman, says that when he heard the bell to stop he threw off the current and applied the brake " very easy." The scream and the emergency bell came almost together. " Up to that the motion of the car was very easy." When the emergency bell came he threw " the brake on very quick." " The effect of that on the car was that it checked up with a quick or more forcible checking."

Mrs. Jesse Ball, who was riding in the front seat of the trailer with Mrs. Sievers, testifies :

"When the car was coming down and approaching Twenty-fifth street there, I noticed that it slacked up. That was before he fell off. I looked at the man. He reached down in his pocket to get his fare, and I didn't see him when he fell. When that scream came, up to that time I do not think there had been any jerk or surge of the car."

Dr. Bostleman swears the car was slowing up for the crossing when the accident happened. " Up to the time that he fell the motion of the car was regular, the usual method of slowing up."

R. W. Erickson, who was sitting in the second seat of the trailer, testifies :

" When I saw the man in the act of falling, there was not at that moment, nor had there been, any jerk or surge of the car of any kind except the ordinary motion of slowing up."

John E. Murphy, who was seated in the motor car facing the trailer, says :

" When the screaming came, up to that time in the slowing up of the car there had not been any unusual motion. No jerking or surging of the car in any shape." After the screaming the car was stopped " very sudden."

Police Sergeant Ryan swears :

" It seemed to me that the brake was applied right after the screaming."

C. T. Haas, who was on the rear seat of the motor car, says:

" Up to the time he fell off there had been no jerk or surging of the train, and no motion outside of the ordinary motion of slowing up. Nothing that disturbed anybody in their seats, or anything like that."

It is plain from the foregoing citations that upon the vital issue in this case the evidence is conflicting and contradictory, and that the number of witnesses whose testimony tends to establish the contention of appellant is greater than is that of those witnesses who favor the contention of appellee; and yet the jury found a verdict for appellee. As an appellate tribunal, what is our duty in the premises? Will it do for us to say that if the case had been left to us in the first instance we would decide the other way, and therefore we must reverse the action of the lower court? That question must be answered under the guidance of the decisions of our Supreme Court.

In a common law action, under our constitution, laws and practice, a jury is called in from the body of the people to assist in the trial. To these jurors are submitted all questions of fact. They see and hear the witnesses, and upon them is placed the responsibility of passing upon the credibility of the witnesses and of determining upon which side is the greater weight of the evidence.

From the many cases in our reports relating to this inquiry we select the following:

" The rule of law is well established, that in cases where the verdict of the jury has been given contrary to the evidence, or where there is no evidence at all to support the verdict, the court will interfere and relieve the party prejudiced by such finding, by the granting of a new trial. But where there is a contrariety of evidence on both sides, and the facts and circumstances, by a fair and reasonable intendment, will warrant the inferences of the jury, courts will reluctantly, if ever, disturb their verdict, notwithstanding it may appear to be against the strength and weight of the testimony. So, where the verdict depends upon the credibility of the witnesses, it is the peculiar province of the jury to judge of that credibility, to attach such weight to

the testimony of each as may seem to be proper, after a due consideration of all the circumstances arising in the particular case." Lowry v. Orr, 1 Gilm. 83.

" It is the peculiar province of a jury to weigh evidence, and reconcile it, if possible; or, if that can not be done, then to decide according to the weight of the evidence, as it may appear to them. * * * Unless a verdict is manifestly against the weight of the evidence it will not be disturbed." Tolman v. Race, 36 Ill. 477.

" In this conflict of evidence it was for the jury to reconcile it if they could, and if that could not be done, they were required to consider all the circumstances relating to the witnesses, and give such weight to it as they believe it was entitled to receive; to reject such as they believed to be unworthy of belief, and find their verdict on the balance." Haltv v. Markel, 44 Ill. 227.

" If any rule of this court can be so well established as to be neither questioned nor require the citation of authorities to support it, it is that a verdict will not be set aside whenever there is a contrariety of evidence, and the facts and circumstances, by a fair and reasonable intendment, will authorize the verdict, notwithstanding it may appear to be against the strength and weight of the testimony." Ill. Cent. Ry. Co. v. Gillis, 68 Ill. 319.

" Many of the real tests of truth by which the artful witness is exposed, in the very nature of things can not be transcribed upon the record, and hence they can never be considered by this court. For this reason the rule is firmly established that where, as in this case, there is an irreconcilable conflict in the testimony, this court will not reverse the judgment of the trial court, where the evidence of the successful party, when considered by itself, is clearly sufficient to sustain the verdict." Calvert v. Carpenter, 96 Ill. 67.

" The truth is, the rule could not be otherwise, without invading the province of the jury to determine the credibility of witnesses, and to say which of them are to be believed in case of a conflict. To do this would be to dispense with the functions of a jury, and thus destroy its utility altogether." Shevalier v. Seager, 121 Ill. 569.

Most of these cases, with many others to the same effect, are cited and followed in Lourance v. Goodwin, 170 Ill. 393.

" The statement of the rule in some of the cases in this

form, that ' where there is a conflict in the evidence this court will not reverse the decree if the evidence of the successful party, when considered alone, is sufficient to sustain the decree,' is clearly subject to the qualification usually stated in the cases, that the verdict is not clearly against the weight of the evidence." Bradley v. Palmer, 193 Ill. 88.

The rule to be deduced from these authorities is that where the evidence is conflicting an appellate tribunal has no right to set aside the verdict of a jury and the judgment entered thereon, unless it is convinced that such verdict is manifestly against the weight of the evidence. We are not thus convinced in this case.

Second. That the verdict is excessive.

The jury assessed appellee's damages at the sum of $3,000. The deceased left him surviving his widow and six children. At the time of the trial the eldest child was but fourteen years of age. The deceased at the time of his death was forty-two years old. He was a plumber by trade, and when he worked in the shop he earned $4 per day. There was evidence tending to show that his habits were irregular, and that for some time before his death he worked as a teamster and handled coal; and that for such labor he was paid but $2 per day. The evidence, however, shows that with what he earned he supported, or at least helped to support his family. Appellee says:

" He was not idle a good deal of the time. He always gave me what he earned. He worked at his trade of plumbing, unless there was a big strike, then he could not work. Then he did a little repairing around, so that we could live."

Six months before his death his wife left him, taking the children with her. But he continued to give money to appellee and visited the wife and children frequently. Appellee says that the morning before his death they made up their differences and resumed living together. When he went to his death he came out of a plumbing shop to take the car, carrying in his arms a kitchen sink, which he set down in front of the witness Mrs. Sievers. The jury

in awarding appellee $3,000 instead of $5,000, the limit fixed by the statute, must have had in mind all the facts and circumstances revealed in the evidence concerning this unfortunate man's life and habits. There is no hard and fast rule by which damages in these' cases can be computed :

" What may be in fact the damages here can only be conjectured; in homelier English, guessed at. Under such circumstances the verdict of the jury, unless the court can say that it was dictated by passion and prejudice, and was not rendered in the exercise of their discretion and sound judgment, should be final." Bradley v. Sattler, 54 Ill. App. 504; Cicero & Proviso St. Ry. Co. v. Boyd, 95 Ill. App. 515.

" It is not enough to say that in the opinion of the court the damages are too high and that we should have given much less. It is the judgment of the jury and not the judgment of the court which is to assess the damages in actions for personal torts and injuries. * * * The measure of damages in actions of tort is vague and uncertain, depending upon a vast variety of causes, facts and circumstances in the state, grade, quality, trade or profession of the party injured, as well as the party who did the injury. * * * In short, the damages must be flagrantly outrageous and extravagant, or, the court can not undertake to draw the line, for they have no standard by which to ascertain the excess." Chief Justice Kent in Coleman v. Southwick, 9 John. 45.

We are satisfied that the verdict in this case is not excessive.

Third. That the trial court should have granted a new trial on the ground of newly-discovered evidence.

After the motion for a new trial had been overruled and judgment entered on the verdict, in the same term, appellant moved the court to vacate such orders and to grant a new trial. In support of this motion it filed the affidavit of John R. Harrington, in which the newly-discovered evidence in part is that the deceased, October 15, 1897, in an affidavit filed by him in a suit which he brought against the city of Chicago for injuries received by falling through a defective sidewalk some six days previous, stated that he was " unable to pay the costs and expenses of a suit at law,"

and that "he has no money on hand and no property and no income from any source whatever." The deceased further stated that he was not only seriously injured by such fall, but that he would remain permanently injured. The affidavit for a new trial concludes:

"And in addition to this, affiant is informed and believes that said Gustav Bohnow, for a period of one or more years prior to his death was addicted to the excessive use of alcoholic beverages, and that his habit in that regard greatly interfered with his earning any money and consumed a great proportion of his earnings, and that in fact he earned very little and was practically a pauper."

To authorize a new trial on the ground of newly-discovered evidence, it must appear that the evidence has been discovered since the trial, and that it could not have been produced on the trial by the use of reasonable diligence. The evidence must also be material to the issue, and relate to the merits of the case. And it must not be cumulative merely, nor go to impeach the character of a witness. (Crozier v. Cooper, 14 Ill. 141.) The newly-discovered evidence must appear to be conclusive in its character. (Conlan v. Mead, 172 Ill. 16.) If it goes in mitigation only of the damages, it is not ground for a new trial, as it is the effect that the evidence would have on the issues alone that entitles it to weight in the determination of the motion. (Schlencker v. Risley, 3 Scam. 486.) A new trial will not be granted for the purpose of permitting the introduction of additional evidence. (Lathrop v. People, 197 Ill. 177.) The application for a new trial must be supported by the affidavits of the witnesses by whom it is proposed to prove the matters relied upon, or some excuse must be shown for not producing them. (Cowan v. Smith, 35 Ill. 417.)

Tried by these rules it is evident that the affidavit in support of the motion for a new trial is clearly insufficient. That part of the affidavit referring to the habits of the deceased is upon information and belief, without stating the grounds therefor; an affidavit of the witness by whom these habits are to be shown is not presented, nor is any reason given for its absence; such evidence goes to the

measure of damages only—not to the issue—and it is cumulative in its character.    The allegation concerning the suit against the city, if true, is not conclusive.    The affidavit filed by the deceased as a poor person is dated October 14, 1897.    His death occurred in July, 1900.    An interval of thirty-three months separates the two dates.    That the deceased was poor when he died and always had been so, is probably true.    The law recognizes this very common condition by granting to one thus situated the privilege of beginning and conducting a law suit without the payment of costs.    To avail one's self of this privilege does not brand one for all time as penniless, nor render him ever after incapable of earning a living.    It is in evidence that after 1897 the deceased did work, and in part, at least, did support his wife and children.

It follows that the court below did not err in overruling the motion for a new trial.

The judgment of the Superior Court will be affirmed.